J-A23033-18

2019 PA Super 249

| | |
|---|---|
| ESTATE OF ALBERT MIKESKA, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: KAZIMIRA MIKESKAITE DILKEVICIENE (ESTATE) AND TEOFILE MIKESKAITE STRIGUNIENE, PATERNAL COUSINS; KAZIMIERA ANGLICKIENE (HEIR- REGINA SAMOSKIENE), MATERNAL AUNT; AND PETRAS PUKELIS (HEIRS - REMIGIJA URBIETIENE, GINTAUTAS PUKELIS, PETRAS PUKELIS, & TOMAS PUKELIS), ALEKSANDRA STUMBRIENE, ZIGMUNTAS MATUTIS, MARIJA GANDRAMAVICIENE, FELIKSAS PUKELIS, JUOZAPAS PUKELIS, STASE PUKELYTE GRISKEVICIENE, JONAS PUKELIS, STEPONAS PUKELIS, ANTANAS PUKELIS (ESTATE), JUZEFA ANTANAITYTE JAKUBAUSKIENE, JANINA VAITKEVICIENE (HEIRS - JADVYGA VAITKEVICIENE AND BENEDIKTAS VAITKEVICIUS), EUGENIJA ALISAUSKIENE, VYTAUTAS BAURA (HEIRS - IRENA BAURIENE & EVALDAS BAURA), ALGINA ALIUTE POTRIENE, DANUTE MARIJA PALIOKIENE, IRMA VALAITIENE, ALDONA TIMOFEJEVA, PETRAS PUKELIS, MATERNAL COUSINS, THE LITHUANIAN HEIRS | |
| | No. 1768 WDA 2017 |

Appeal from the Order Entered November 1, 2017
In the Court of Common Pleas of Allegheny County
Orphans' Court at No.: 02-15-01826

BEFORE: BOWES, SHOGAN, and STABILE, JJ.

OPINION BY STABILE, J.:                                    FILED AUGUST 20, 2019

Appellants, twenty-two alleged heirs of the estate of Albert R. Mikeska, deceased, appeal from an order denying their exceptions to the first and final account of the co-administrators of Mikeska's estate ("estate"). Appellants, who all reside in Lithuania, contend they have an interest in Mikeska's estate. We affirm.

Jonas Mikeska and his brother, Juozapas Mikeska, moved from Lithuania to America when they were young. Jonas married another Lithuanian immigrant, and Albert Mikeska, born in America, was their only son. Juozapas had two children in America, and he died in 1974.

On January 8, 2015, Albert died intestate. On March 23, 2015, the Allegheny County Register of Wills granted letters of administration to Juozapas's two children (and Albert's first cousins), Delores Mikeska Morante and Stanley Mikeska, to serve as co-administrators of Albert's estate. The estate filed a certification that the co-administrators were the only persons entitled to share in the estate.

Around this time, the estate became the target of heir hunters, individuals or entities who attempt to locate heirs of estates in return for compensation. A reporter retained by Kemp & Associates ("Kemp"), a Utah firm that identifies and locates missing heirs, notified Kemp about Albert's estate. Kemp contacted Hoerner Bank, a German bank that locates heirs internationally, and the bank retained Rolandas Brazauskas, a Lithuanian attorney and genealogist, to identify any Mikeska heirs in Lithuania. Brazauskas graduated from Vilnius University in 1981 and has worked

- 2 -

extensively in the genealogical field. He reads, writes and speaks English and has testified as a genealogy expert in four United States cases. Brazauskas provided his research to Hoerner Bank, which provided it to Kemp. Kemp hired Jeffrey McCamic, Esquire, an attorney licensed to practice law in Pennsylvania, to represent Appellants in Allegheny County Orphans' Court.

Brazauskas's partner, Lithuanian attorney Danute Morkuniene, contracted with Appellants to represent them in documenting and proving their relationship to Albert Mikeska. Each Appellant entered into a fee agreement with "Danute Morkuniere, Attorney at Law of D. Morkuniene and R. Brazauskas Law Office." Each fee agreement provided: "The client shall pay overall fee of [Kemp firm employees] Brian O. Kraus and Barbara S. Williams,[1] Hoerner Bank AG and the Attorney [Morkuniere] of 25%, which is calculated from the total share to which the Client is entitled in the above captioned estate." Further, each agreement provided:

> 1. The fee fixed in accordance to this agreement shall be paid after the estate is concluded. The fee is calculated [out] of [the] total share that the Client is entitled to.
>
> 2. Once it would appear that it is not possible to claim the estate in favor of the Client or it would appear that the Client is not, entitled to the estate, the Client shall not bear responsibility for paying fee fixed in accordance to this agreement . . .

It bears emphasis that McCamic was not a signatory to any agreement with Brazauskas. Instead, Kemp retained Hoerner Bank, which in turn retained Brazauskas. Neither was McCamic a signatory to any agreement with

_____

[1] Neither Kraus nor Williams is an attorney.

Appellants. Instead, Kemp hired McCamic to represent Appellants, and Appellants entered into fee agreements with Brazauskas's law partner.

On July 14, 2015, McCamic entered his appearance for Appellants, listing each Appellant "c/o" (in care of) Kraus and Williams of the Kemp firm.

On June 8, 2016, the estate filed a motion for distribution asserting that the co-administrators were Albert's sole and rightful heirs under a family settlement agreement. Appellants filed an objection to this motion and their own petition to acknowledge themselves as heirs. The estate subsequently filed a first and final account. In response, Appellants withdrew their petition to acknowledge themselves as heirs, withdrew their objection to the estate's motion for distribution, and filed an objection to the first and final account.

The case proceeded to a hearing in Orphans' Court. On February 8, 2017, McCamic called Brazauskas to testify as an expert relating to the acquisition of the genealogical records necessary to document Appellants' relationship to Albert Mikeska. The court declined to recognize Brazauskas as an expert but permitted him to testify about how he obtained the documents submitted as exhibits at the hearing. Brazauskas testified that he established Appellants' relationship to Albert by obtaining 136 genealogical documents from Lithuania's central historical archives. According to Brazauskas, most of these documents were "certified copies" bearing apostilles, i.e., confirmation by Lithuania's Historical Archives that the documents were authentic. N.T., 2/8/17, at 33-34. McCamic presented these documents to the court during Brazauskas's testimony.

On cross-examination, counsel for the estate asked Brazauskas who was paying his fee. Brazauskas answered, "The fees, after I'm able to prove the kinship of my client to here, we are receiving the funds from the estate administrator, and then they are paying my fee." Id. at 37. The court asked, "Out of the estate, or at least your client's share of the estate?" Id. Brazauskas answered, "If the estate administrator releases the funds for my clients." Id. at 38. Counsel for the estate asked, "So if the 22 purported Lithuanian heirs don't recover anything, you don't get paid, is that correct?" Brazauskas answered, "Yes." Id. Thus, Brazauskas agreed that he was testifying on a contingent fee basis. The record does not indicate whether McCamic was aware of Brazauskas's contingent fee agreement prior to this testimony.

The estate moved to strike Brazauskas's testimony on the ground that he was testifying on a contingency fee basis in violation of Rule 3.4 of the Pennsylvania Rules of Professional Conduct. The court held this motion under advisement.

On June 21 and 22, 2017, Appellants testified about their family history, their relationship with Albert, and their correspondence with Albert's mother. On July 13, 2017, Kemp employee Williams testified about, inter alia, the nature of Kemp's business, its dealings with Hoerner Bank, and its retention of McCamic in these proceedings.

At the close of evidence, the court granted the estate's motion to strike Brazauskas's testimony in its entirety and dismissed Appellants' objections to

the first and final account. Appellants filed a timely appeal, and both Appellants and the court complied with Pa.R.A.P. 1925.

Appellants raise the following issues in this appeal:

1. Did the trial court err as a matter of law in granting the Estate's Motion to Strike the Testimony of Rolandas Brazauskas?

2. Did the trial court err as a matter of law in dismissing the Lithuanian Heirs' objection to First and Final Accounting through:

a) The Court's failure to recognize the testimony of the Lithuanian Heirs presented in support of their claim;

b) The Court's failure to recognize the documentary evidence the Lithuanian Heirs presented in support of their claim;

c) The Court's acceptance of the Estate's First and Final Accounting despite the Estate having notice that the decedent may have heirs in Lithuania and its failure to investigate;

d) The Court's acceptance of the Estate's objections to the Lithuanian Heirs' claim due to the genealogical record supporting their claim having been submitted after a one-year statute of limitation; and

e) The Court's acceptance of the Estate's argument of champerty.

Appellants' Brief at 3.

Although we agree with Argument 2(b) of Appellants' brief that their documentary evidence was admissible, we affirm for two reasons. First, the Orphans' Court properly struck Brazauskas's testimony in its entirety because his agreement to testify in return for a contingency fee violated Pennsylvania common law. Second, the Orphans' Court, sitting as factfinder, acted within its discretion by concluding that Appellants' testimony had little or no

probative value. Collectively, the Orphans' Court's exclusion of Brazauskas's testimony and decision to give virtually no weight to Appellants' testimony caused Appellants' case to fail due to lack of sufficient evidence of their interest in Albert's estate.

At the outset, we note our disagreement with the trial court's decision not to admit Appellants' documentary evidence into evidence.[2] Each Appellant submitted a Certificate of Archives, signed and sealed by officials from the State Archives of History of Lithuania, which certified the date and location of his or her birth. Each certificate was submitted in Lithuanian and translated into English.

Pa.R.E. 902 provides in relevant part:

The following items of evidence are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted: . . .

(3) A document that purports to be signed or attested by a person who is authorized by a foreign country's law to do so. The document must be accompanied by a final certification that certifies the genuineness of the signature and official position of the signer or attester--or of any foreign official whose certificate of genuineness relates to the signature or attestation or is in a chain of certificates of genuineness relating to the signature or attestation . . . If all parties have been given a reasonable opportunity to investigate the document's authenticity and accuracy, the court may for good cause, either:

_____

[2] We review the trial court's decisions on admissibility of evidence for abuse of discretion. U.S. Bank, N.A. v. Pautenis, 118 A.3d 386, 391–92 (Pa. Super. 2015) ("decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law").

(A) order that it be treated as presumptively authentic without final certification; or

(B) allow it to be evidenced by an attested summary with or without final certification.

Id. In our view, Appellants' certificates satisfy Rule 902(3),[3] and the trial court should have admitted them as self-authenticating.

_____

[3] Appellants' certificates also satisfy 42 Pa.C.S.A. § 5328, entitled "Proof of official records," a statute similar in content to Rule 902(3), which provides in relevant part:

> (b) Foreign record.—A foreign official record, or an entry therein, when admissible for any purpose, may be evidenced by an official publication or copy thereof, attested by a person authorized to make the attestation, and accompanied by a final certification as to the genuineness of the signature and official position:
>
> (1) of the attesting person; or
>
> (2) of any foreign official whose certificate of genuineness of signature and official position either:
>
> > (i) relates to the attestation; or
> >
> > (ii) is in a chain of certificates of genuineness of signature and official position relating to the attestation.
>
> . . . If reasonable opportunity has been given to all parties to investigate the authenticity and accuracy of the documents, the tribunal may, for good cause shown, admit an attested copy without final certification or permit the foreign official record to be evidenced by an attested summary with or without a final certification.

42 Pa.C.S.A. § 5328(b).

We now turn to the Orphans' Court's ruling that Brazauskas's testimony was inadmissible. The Orphans' Court excluded Brazauskas's testimony based on its conclusion that McCamic violated Pennsylvania Rule of Professional Conduct 3.4 by paying Brazauskas a contingent fee for his testimony.[4] Trial Ct. Op., 2/8/18, at 3. We affirm this ruling but for a different reason.

In McCarthy v. Southeastern Pennsylvania Transportation Authority, 772 A.2d 987 (Pa. Super. 2001), this Court held that a trial court may sanction counsel by disqualification based upon a violation of the Rules of Professional Conduct only when a court has determined disqualification is needed to ensure the parties receive the fair trial that due process requires. Id. at 987. Both trial and appellate courts, however, may not sanction counsel for violations of the Rules of Professional Conduct to impose punishment for attorney misconduct. McCarthy, citing Reilly by Reilly v. SEPTA, 489 A.2d 1291, 1299 (Pa. 1985). Our Supreme Court has not abdicated or delegated any of its administrative or supervisory authority over the judiciary to lower courts. Id. Nonetheless, where disqualification is required to ensure parties receive the fair trial which due process requires, a court may sanction counsel for violation of the Rules of Professional Conduct. There must, however, be

_____

[4] Pennsylvania Rule of Professional Conduct 3.4 prohibits attorneys from "pay[ing], offer[ing] to pay or acquiesc[ing] in" the payment of fees to witnesses that are contingent on the outcome of the case. Pa.R.P.C. 3.4(b).

evidence in the record to support a conclusion that the attorney did in fact violate a particular rule.

Here, the evidence of any Rule 3.4 violation is less than clear. Although McCamic was Appellants' counsel and was presenting Brazauskas's testimony in support of their claims, the record does not reflect that there was any contingent fee agreement directly between Brazauskas and McCamic. Nor does the record demonstrate that McCamic knew before counsel for Appellants cross-examined Brazauskas during the February 8, 2017 hearing that Brazauskas had a contingency agreement with Appellants. It appears Brazauskas's firm had a contingent fee agreement with Appellants, but that agreement was silent as to counsel also acting as an expert witness. Given this lack of a developed record on McCamic's conduct vis-à-vis the Rules of Professional Conduct, the Orphans' Court did not have discretion to exclude Brazauskas's testimony for violation of our Rules of Professional Conduct. On the other hand, in our view, resort to the Rules of Professional Conduct as a basis for excluding this testimony was not necessary, because Pennsylvania common law furnishes a sufficient basis for excluding Brazauskas's testimony.[5]

_____

[5] We may affirm the Orphans' Court's ruling on any basis, even one the Orphans' Court itself did not provide. Blumenstock v. Gibson, 811 A.2d 1029, 1033 (Pa. Super. 2002).

- 10 -

In Belfonte v. Miller, 243 A.2d 150 (Pa. Super. 1968), a landowner hired a realtor to appraise her real estate for the purpose of obtaining damages in eminent domain proceedings. The realtor also agreed to testify should it prove necessary. The payment stipulated in the agreement was a designated percentage of any amount the landowner received from the eminent domain proceedings. This Court held that the contingent fee agreement between the landowner and realtor was unenforceable, reasoning:

> Section 552 of the Restatement of Contracts states: 'A bargain to pay one who is subject to legal process, a sum for his attendance as a witness in addition to that fixed by law, is illegal, except as stated in Subsection (2) (which provides:) 'A bargain to pay an expert witness for testifying to his opinion a larger sum than the legal fees provided for other witnesses is illegal only if the agreed compensation is contingent on the outcome of the controversy.' . . . Similar support can be found in Professor Corbin's work. 'It is not illegal to compensate a witness who is out of the jurisdiction and not subject to subpoena, if payment is not contingent on success in the litigation or on his testifying in a specified manner. * * * A bargain to pay an expert witness compensation for services such as these (special investigations by expert witnesses or otherwise for the purpose of learning or determining the facts or of accumulating evidence or forming an opinion) is not illegal; always provided that payment is not contingent on success in litigation affected by the evidence or on condition that the opinions expressed or facts testified to shall be of a specified character.' 6A Corbin, Contracts § 1430. Cf., In re Certain Lands in the City of New York, 144 App. Div. 107, 128 N.Y.S. 999 (1911); Van Norden v. Metson, 75 Cal.App.2d 595, 171 P.2d 485 (2d Div. 1946) . . .
>
> The rule applied to such contracts is not to be affected by proof that the behavior of the parties was in fact exemplary, for it is the tendency of such contracts which serves to generate their undesirability. Improper conduct or bias can be predicted easily when the compensation of the witness is directly related to the absolute amount of an award which may in turn be dependent to a great degree on the testimony of that same witness.

Id. at 153.

While Belfonte invalidated a contingent fee agreement with an expert witness, it does not appear that Pennsylvania appellate courts have addressed whether contingent fee agreements with fact witnesses are illegal or what the remedy should be in the event of such an agreement. Even so, it is obvious that Belfonte's reasoning extends to contingent fee agreements with fact witnesses. Such agreements jeopardize the integrity of the judicial process by encouraging fact witnesses to depart from the truth to generate a higher award and thus a higher witness fee. It makes no difference whether the witness enters the agreement with an attorney, a plaintiff, or some third person, because the danger to the integrity of the judicial process remains the same. We also conclude that when such an agreement with a fact witness comes to light, the trial court has the authority to preclude the witness's testimony to safeguard the judicial process. This measure is consistent with decisions from other jurisdictions that have stricken testimony or reports from both expert and fact witnesses for agreeing to testify under contingency fee agreements.[6] See Straughter v. Raymond, 2011 WL 1789987, *3 (C.D. Cal. 2011) (expert's opinions "were rendered when she had a direct financial

_____

[6] Although we are not bound by decisions from other jurisdictions, "we may use [them] for guidance to the degree we find them useful and not incompatible with Pennsylvania law." Newell v. Mont. W., Inc., 154 A.3d 819, 823 & n.6 (Pa. Super. 2017).

interest in the outcome of this action" even though she subsequently revoked her contingency fee arrangement; testimony excluded)); Followwill v. Merit Energy Co., 2005 WL 5988695, *1 (D. Wyo. 2005) (excluding plaintiffs' expert witness and striking his report because he was paid on contingency basis); Farmer v. Ramsay, 159 F.Supp.2d 873, 883 (D. Md. 2001) ("improper to pay an expert witness a contingent fee" under Maryland law; report stricken); Cosgrove v. Sears Roebuck & Co., 1987 WL 33595, *1-2 (S.D.N.Y. 1987) (proceedings tainted by contingency fee agreement; expert precluded from testifying); State of New York v. Solvent Chemical Co., Inc., 166 F.R.D. 284, 289 (W.D.N.Y. 1996) (citing In re Robinson, 151 A.D. 589, 600, 136 N.Y.S. 548 (1st Dpt. 1912)) (agreement with fact witness for "payment of a sum of money to a witness to testify in a particular way" or "payment of money to a witness to make him 'sympathetic' with the party expecting to call him" was "absolutely indefensible"; "[t]he payment of a sum of money to a witness to 'tell the truth' is as clearly subversive of the proper administration of justice as to pay him to testify to what is not true").

In this case, two fee arrangements relate directly or indirectly to Brazauskas. Brazauskas had an agreement with Hoerner Bank to identify any Mikeska heirs in Lithuania, and Brazauskas's law partner, Morkuniene, had contingent fee agreements with each Appellant. Critically, Brazauskas testified that his fee was contingent, because it depended on whether the Orphans' Court held that Appellants had an interest in Albert's estate, and the

amount of his fee depended on the percentage of Appellants' decreed interest in the estate. The clear import of this testimony is that if Appellants did not recover anything, Brazauskas did not get paid under either fee arrangement. N.T., 2/8/17, at 38. In view of Belfonte and the persuasive authorities gathered above, the Orphans' Court acted within its discretion by excluding Brazauskas's testimony in its entirety.

We also agree that the Orphans' Court properly exercised its discretion in ruling that Appellants' testimony deserved little or no weight.

In a non-jury proceeding such as this, "the factfinder is free to believe all, part, or none of the evidence." L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, 777 A.2d 1090, 1093 (Pa. Super. 2001). "Credibility determinations and consideration of conflicts in the evidence are within the purview of the trial court." John B. Conomos, Inc. v. Sun Company, Inc., 831 A.2d 696, 703 (Pa. Super. 2003).

The Orphans' Court opined as follows with regard to Appellants' testimony:

> While each of the twenty (20) persons that testified identified personal documents, none of these persons had firsthand knowledge of, or had ever met, the Decedent and they only became aware of his death from Mr. Brazauskas. The most that any of the witnesses could testify to was that they were aware through discussions with other family members that some family members had moved to America. No one was able to give any specific date or location of the move to America. Accordingly, the Court gave minimal if any weight to their testimony.

- 14 -

Pa.R.A.P. 1925(a) Opinion, 2/9/18, at 3-4. This determination was well within the Orphans' Court's purview as the fact-finder in this case.

Having determined that (1) Appellants' documentary evidence was admissible as self-authenticating, (2) the Orphans' Court correctly excluded Brazauskas's testimony, and (3) the Orphans' Court correctly found Appellants' testimony to have little or no weight, we conclude that Appellants' case fails due to lack of sufficient evidence linking them to Albert Mikeska. Absent Brazauskas's testimony, there is no genealogical evidence establishing that they are Albert's rightful heirs. Standing alone, the documentary evidence merely establishes when and where Appellants were born, not whether they are relatives of Albert. Appellants' own testimony does not make up for this shortfall due to the Orphans' Court's finding that it has little or no weight.

Because we hold that Appellants' action fails for lack of sufficient evidence, we need not address Appellants' statute of limitation or champerty arguments (issues 2(d) and (e)) or their argument that the estate failed to conduct a proper investigation (issue 2(c)). We affirm the Orphans' Court's order denying Appellants' exceptions to the estate's first and final account.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/20/2019</u>