J-S13002-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF REGINA W. BROWN, DECEASED | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: PHILIP R. BROWN | : : : : : : : : | |
| | : | No. 733 MDA 2024 |

Appeal from the Order Entered April 26, 2024
In the Court of Common Pleas of Wyoming County Civil Division at
No(s):  OCD 2020-08

BEFORE:  PANELLA, P.J.E., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY PANELLA, P.J.E.:        **FILED: MAY 1, 2025**

Philip R. Brown ("Philip") appeals from the Orphans' Court's Order denying his Petition for Citation for Will Appeal, to set aside the Last Will and Testament of his mother, Regina W. Brown ("Decedent"). Philip argues Decedent's Will was the product of undue influence. We affirm.

Decedent died on February 4, 2019, at the age of ninety-three, leaving three adult children, Philip, Dale C. Brown ("Dale"), and David J. Brown ("David"). On March 13, 2018, Decedent executed a Will ("the 2018 Will") wherein Decedent appointed her son Dale as executor. Following Decedent's death, Dale filed a petition for grant of letters testamentary for Decedent's estate and offered the 2018 Will for probate. The Register of Wills subsequently entered a decree of probate and granted letters testamentary to Dale as executor.

On March 13, 2020, Philip filed a petition for citation for will appeal pursuant to 20 Pa.C.S.A. § 908. The original petition filed by Philip alleged Dale acted in a manner to manipulate Decedent in making the 2018 Will by exerting undue influence over his mother. Almost 2 years later, on October 6, 2021, Philip filed a first amended petition for citation for will appeal, including both Dale and David as respondents to the petition.

Hearings were subsequently held on April 18, 2023, May 23, 2023, and September 29, 2023. Following the hearings, the matter was held open for the parties to depose the attorney who prepared the 2018 Will and for the parties to file post-trial memorandums. The orphans' court summarized the testimony, including depositions, as follows:

> Decedent[] was a loving mother who never wanted any controversy between her children. Decedent was an avid reader who enjoyed doing crossword puzzles. Decedent's son Dale became her Power of Attorney in 2007. Decedent was aware of her finances and directed her son Dale to pay her bills. Up until 2019, the year of her death, Decedent would sign her own checks that were prepared by her son Dale. Decedent was religious and read her Bible daily.
>
> Decedent and her husband owned an approximately two hundred seventy-five (275) acre farm. Following Decedent's husband's death, he left his estate to Decedent, including the farm. In 2009, Decedent sold approximately Two Hundred Fifty-Nine (259) acres of the farm to Petitioner, Philip [], for the sum of Three Hundred Fifty Thousand Dollars.
>
> Donna Labar, a real estate broker, was retained by Philip [] in November of 2020 to appraise the farm with an effective date of October 7, 2004[,] appraising the farm at Three Hundred Eighty-Nine Thousand Dollars ($ 389,000.00). Dale and David [] also retained an appraiser, Donald Van Fleet, to appraise the farm with an effective date of December of 2009. That appraisal appraised

the farm with a value in excess of Nine Hundred Thousand Dollars ($ 900,000.00). Ms. Labar testified that she agreed with Mr. Van Fleet's appraisal.

In February of 2018, just one month prior to Decedent changing her will, Philip [] asked Decedent to change the deed to reflect that [Philip]'s son and grandson would be in succession ahead of David [] to receive the farm. Philip testified that when he asked Decedent to put his grandson[] on the deed to the farm, Decedent was competent to sign the deed and that she understood what she was doing. Philip further testified that on February 14, 2018, when Decedent executed the new deed, she was competent. Yet, less than one month later, on March 13, 2018, when she executed the 2018 Will, she had weakened intellect.

Shortly after the execution of the new deed, David [] read about it in the local newspaper. As a result of this, David [] asked Decedent's previous attorney, who had retired, Sally Steele, if it would be unethical for him to ask his mother to change her will. Based upon Attorney Steele's response, David and Dale [] approached their mother, who was responsive to changing the will. More specifically, David [] said to the Decedent:

Q. What I'm asking is, what was it you presented her with?

A. First of all we said, "Mother, you know, you — [Philip] got, and Scott, got the farm at a discounted appraisal." I mean, Mother, even when Mother approached me about it, I mean, we sort of knew the deal, you know, hey why wouldn't I buy it, you know, back in the beginning, okay. Alright? I mean, there was a, why not, you know. So, Mother knew from the beginning that they got a real discount on the farm, okay.

At or around this same time, it came to David[]'s attention that when Philip [] purchased the farm at a discounted price, he also took all of the farm equipment and tools that was there without paying for the same.

Thereafter, David and Dale [] went to Attorney Thomas Daniels regarding the changes. Following their initial meeting, a draft was provided for David and Dale to go over with the Decedent.

The 2018 Will was drafted by Attorney Thomas Daniels, a practitioner in Wyoming County. Throughout his career, a

- 3 -

significant part of Attorney Daniels' practice has been the preparation of last wills, testaments, powers of attorneys and estate planning documents. More specifically, Attorney Daniels testified that the preparation of wills is a regular portion of his practice. The preparation of the estate documents that are at issue in this matter was Attorney Daniels' sole involvement in this matter and he does not have any financial involvement nor is he receiving any financial renomination for the probate of the Estate of [Decedent].

Attorney Daniels was initially contacted on March 7, 2018 by relatives, namely David and Dale [], of the Decedent [who] approached him concerning their mother's Last Will and Testament. He was provided with documents from Decedent's prior counsel and relative, Sally Steele, Esquire, who had retired from practicing law. After Attorney Daniels drafted the 2018 Will, he provided it to David and Dale [] to review with Decedent. Thereafter, Attorney Daniels volunteered to meet [Decedent] at a family property to review and supervise the execution of the Will.

On March 13, 2018[,] Attorney Daniels, his wife Tammy Daniels and son went to the Brown farm property to meet with Decedent and consult her concerning her Last Will and Testament. Because Attorney Daniels had not previously met with Decedent, Attorney Daniels testified that "when I am dealing with an elderly client, I spend some time. I wanted to talk with her just about the will and also talk about her life in general. I asked her if she was aware of, you know, her family matters and who her sons were, you know, small talk, if you will, just to satisfy myself that she was capable and competent to execute the document. I probably spent 10 minutes or so doing that. And then I explained, and introduced and asked her if she understood why I was there. And she did indicate that she understood why I was there." Attorney Daniels read the entire will to Decedent and discussed with her that the document went from three (3) residual beneficiaries to two. When explaining to Decedent that Philip was no longer a co-residuary beneficiary of her estate, she confirmed this intention and explained that during her lifetime, Philip had already been given the opportunity to purchase the farm property from the family for less than its actual value. In fact, the will itself contains the following language that was reviewed with and read to Decedent by Attorney Daniels:

"I have intentionally not made any provision for my son, PHILIP R. BROWN, to share in my residuary estate as he was afforded the opportunity and did in fact purchase from me the title to the original Farm Property during my lifetime at a price significantly less than its actual fair market value and which remains of significant value and worth to him."

At no time did Decedent appear frightened or afraid. Rather, she seemed calm and understood what Attorney Daniels was doing and explaining. Given his concerns about the change in the residual clause of Decedent's 2018 Will, Attorney Daniels generated a memorandum to memorialize the execution of Decedent's Will. Attorney Daniels did not prepare this memorandum because he was concerned about Decedent's ability to execute the Will but rather because of his knowledge of the Brown family dynamics and anticipation of the instant situation.

Attorney Daniels['] testimony was reinforced by the testimony of a witness to the execution of the will, Tammera Daniels, the wife of Attorney Daniels and a nurse.

On Thanksgiving Day 2018, Decedent suffered injuries when she fell[,] causing her to be hospitalized. Knowing she would need rehabilitation, Decedent chose herself to go to Meadows in Dallas, Pennsylvania. She remained there until a week prior to her death. While at Meadows, Decedent was able to make decisions regarding her own care and treatment. In fact, in January or February of 2019, Decedent was suffering from a lot of diarrhea and advocated for herself and it was discovered that Meadows was giving her laxatives.

Orphans' Court Opinion, 4/26/24, at 3-7 (citations omitted). Based on the above factual findings, the orphans' court subsequently denied the petition. This appeal followed.

Philip raises the following issue on appeal:

1. Did the orphans' court err as a matter of law or abuse its discretion by incorrectly applying the standard outlined in **Estate of Clark**, 334 A.2d 628 (Pa. 1975) and its progeny by applying or assigning the incorrect and higher burden of proof and standard to [Philip] to establish undue influence pertaining to the creation

and execution of [the 2018 Will] and, then, in failing to shift the burden of proof to [Dale and David] to establish the absence of undue influence?

a. Did the orphans' court err as a matter of law or abuse its discretion when it incorrectly applied a higher standard of proof upon [Philip] to establish lack of testamentary capacity rather than [] Decedent suffered from a weakened intellect and not concluding that she suffered from a weakened intellect, prior to and during the creation and execution of the [2018 Will], and in failing to give any weight, consideration to or address the testimony of the expert, Richard E. Fischbein, M.D., presented by [Philip], which the orphans' court ignored and instead relied upon the self-serving testimony of [Dale and David] and their witnesses?

b. Did the orphans' court err as a matter of law or abuse its discretion when it failed to conclude that [Philip] established that a confidential relationship existed between [Dale and David], and [] Decedent, before and during the creation and execution of the [2018 Will], thereby shifting the burden of proof to [Dale and David] to establish, by clear and convincing evidence, that a confidential relationship did not exist and which they individually and together failed to do?

C. Did the orphans' court err as a matter of law or abuse its discretion when it failed to conclude that [Philip] established that [Dale and David] received the bulk of the remainder of [] Decedent's estate or a substantial benefit resulting from the creation and execution of the [2018 Will], thereby shifting the burden to [Dale and David] to establish otherwise and which they individually and together failed to do?

Appellant's Brief, at 4 (unnecessary capitalization omitted).

This Court's standard of review in a will contest is restricted to determining whether the trial court's factual findings are supported by the record:

In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining

- 6 -

whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

***In re Estate of Schumacher***, 133 A.3d 45, 49-50 (Pa. Super. 2016) (citation omitted).

"In making a will an individual may leave his or her property to any person or charity, or for any lawful purpose he or she wishes, unless he or she lacked mental capacity, or the will was obtained by forgery or fraud or undue influence, or was the product of a so-called insane delusion." ***In re Estate of Nalaschi***, 90 A.3d 8, 11 (Pa. Super. 2014) (citation and internal quotation marks omitted).

The resolution of a question as to the existence of undue influence is inextricably linked to the assignment of the burden of proof. Once the proponent of the will in question establishes the proper execution of the will, a presumption of lack of undue influence arises; thereafter, the risk of non-persuasion and the burden of coming forward with evidence of undue influence shift to the contestant. The contestant must then establish, by clear and convincing evidence, a *prima facie* showing of undue influence by demonstrating that: (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question. Once the contestant has established each prong of this tripartite test, the burden shifts again to the proponent to produce clear and convincing evidence which affirmatively demonstrates the absence of undue influence.

***In re Estate of Byerley***, 284 A.3d 1225, 1237 (Pa. Super. 2022) (citations and quotation marks omitted) (citing to the tripartite test as established in ***In re Clark's Estate***, 334 A.2d 628, 632 (Pa. 1975).

Philip generally challenges the orphan's court's finding that no undue influence existed in the creation of the 2018 Will. In three subsections, Philip individually challenges the court's findings pertaining to each prong of the tripartite undue influence test.

First, Philip asserts the trial court committed an error of law by confusing the standard for lack of testamentary capacity with the standard for weakened intellect. Philip argues a demonstration of a weakened mental condition does not need to rise to a demonstration of testamentary incapacity. Philip argues the court erred in concluding Decedent was not of mentally diminished capacity by conflating testamentary capacity with undue influence and by ignoring the expert testimony of Dr. Fischbein.

Philip also notes the testimony provided by his brothers and their witnesses only "scratch[ed] the surface" and relied on superficial anecdotes to show Decedent could meaningfully engage with interests, such as engaging with her religion, or keeping up with her fondness for trivia shows. Appellant's Brief, at 18-19. Philip argues these "surface" observations may have been characteristic of testamentary capacity, but that greater weight should have been placed on Decedent's mental decline. ***See id.*** at 19.

With respect to weakened intellect, this Court has recognized the case-by-case nature of the analysis:

> The weakened intellect necessary to establish undue influence need not amount to testamentary incapacity. Although our cases have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it

is typically accompanied by persistent confusion, forgetfulness and disorientation. Moreover, because undue influence is generally accomplished by a gradual, progressive inculcation of a receptive mind, the "fruits" of the undue influence may not appear until long after the weakened intellect has been played upon. Accordingly, the particular mental condition of the testator on the date he executed the will is not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity. More credence may be given to remote mental history.

*In re Estate of Schumacher*, 133 A.3d at 52 (internal citations and some quotation marks omitted).

Preliminarily, we can find no support for Philip's claim that the court utilized an incorrect standard of review. In the court's opinion accompanying its order denying Philip's petition, the court cites the appropriate standard of review applicable to a finding of undue influence, including the need for the finding of weakened intellect. **See** Orphans' Court Opinion, 4/26/24, at 8. While the court briefly included a reference to testamentary capacity, it appears from our review that this reference was only regarding the need for clear and convincing evidence to support a claim of both testamentary capacity *and* undue influence. Notably, testamentary capacity is not mentioned again after this reference. Instead, the court proceeds to evaluate the three prongs of the undue influence test and concludes Philip did not meet any of the prongs. Specifically, the Orphans' Court found the testimony did not support a finding that a confidential relationship existed between Decedent and Dale and David; that even if a confidential relationship were found, the second prong was not met because while Dale and David received a greater

benefit under the residual clause, Decedent specifically addressed her rationale for removing Philip from the Will; and lastly finding the record reflected that "Decedent was active and mentally competent until the time of her death." *See id.* at 9-10

It appears Philip merely seeks to have this Court reweigh the evidence in his favor to establish Decedent had a weakened intellect. However, this Court may not reweigh the evidence or usurp the trial court's credibility determinations. *See In re Estate of Schumacher*, 133 A.3d at 49-50; *see also Estate of Mikeska*, 217 A.3d 329, 336 (Pa. Super. 2019) (explaining that in a non-jury proceeding, "[c]redibility determinations and consideration of conflicts in the evidence are within the purview of the trial court.") (citation omitted). Accordingly, we cannot conclude the orphans' court either utilized an incorrect standard in addressing the weakened intellect claim or improperly weighed the evidence.

In his final two subsections, Philip contends he met his burden of proving undue influence and that the trial court erred in failing to shift the burden to his brothers. Philip claims Dale and David had a confidential relationship with Decedent. Further, Philip asserts Dale and David received a substantial benefit from the creation of the 2018 Will, receiving the bulk of the remainder of Decedent's estate.

We simply cannot find Philip established a *prima facie* case of undue influence through clear and convincing evidence. Philip's argument fails to

present any compelling authority or logic to support his claim that his brothers were in a confidential relationship with Decedent. Philip highlights that Dale and David had a confidential relationship with Decedent because they visited her almost daily, helped her with grocery shopping and meals, and Dale had power of attorney over Decedent and helped with her bills and financial affairs. *See* Appellant's Brief, at 30-31. However, Philip is again asking this Court to reweigh the evidence in his favor. We again decline to do so. *See In re Estate of Schumacher*, 133 A.3d at 49-50; *see also Estate of Mikeska*, 217 A.3d at 336. The credible testimony cited by the orphans' court supports the court's conclusion that "there is nothing to suggest that the parties did not deal on equal terms" and that the relationships were more than a parent-child relationship. Orphans' Court Opinion, 4/26/24, at 9-10. The record also reflects the court's finding that Decedent left the remainder of her estate to Dale and David because Philip had already received a substantial portion of her land, at a discount, while she was alive.

To prove undue influence, the contestant must establish each prong of the tripartite test before the burden shifts to the proponent of the will. *See In re Estate of Byerley*, 284 A.3d at 1237. As we cannot find Philip met his burden to prove any of the three prongs, the burden would not have shifted to his brothers. Accordingly, as Philip's claim merits no relief, we affirm.

Order affirmed.

Judgment Entered.

![signature] Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary

Date: 05/01/2025